# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------------x
MARK C. O'NEILL, MONIQUE CAIN,       :
JAMES EVARTS, MARCO FRANCIA,         :
WILLIAM L. HOFFMAN,                  :
DANIELA RODRIGUEZ, ERIC SCOTT, and   :
STEPHEN TORQUATI,                    :   Civil No. 3:12CV679 (AWT)
                                     :
             Plaintiffs,             :
                                     :
v.                                   :
                                     :
CITY OF NEW HAVEN,                   :
                                     :
             Defendant.              :
-----------------------------------x
```

## RULING ON MOTION FOR SUMMARY JUDGMENT

The remaining plaintiffs,[1] Mark C. O'Neill, Marco Francia,
Daniela Rodriguez, Eric Scott, and Stephen Torquati, are non-
Hispanic police officers employed by defendant City of New Haven
(the "City") who bring this § 1983 action against the City
alleging that the City intentionally discriminated against them
on account of their race by certifying an eligible list for
promotion to the rank of sergeant for only one year in violation
of the Equal Protection Clause of the Fourteenth Amendment to
the United States Constitution.  The City moves for summary
judgment.  For reasons set forth below, the motion is being
granted in part and denied in part.

---

[1] The court previously granted summary judgment in favor of the defendant as
to the claims brought by plaintiffs Monique Cain, James Evarts, and William L.
Hoffman on the ground that they lacked standing. (See Doc. No. 24.)

I.    **Factual Background**

The plaintiffs are non-Hispanic patrol officers in the New Haven Police Department (the "NHPD").  In April 2009, the City administered an exam for promotion to the rank of sergeant in the NHPD.  Each plaintiff took and passed the exam, and each plaintiff was placed on Eligible List 09-06.  The City uses the "Rule of Three" when filling vacancies for all departments, including the NHPD.  Under that rule, for each vacancy the City may appoint any candidate ranked in the top three.  If Eligible List 09-06 was extended for a second year, the next vacancy would have to be filled by Matthew Deleo, Eric Scott or Bruce Bonner; the second vacancy would have to be filled by either one of the two candidates not selected to fill the previous vacancy or Shafiq Abdussbaur.

The Civil Service Rules govern the duration of all eligible lists.  The Civil Service Rules were amended and the amendments went into effect on February 1, 2008.  Prior to February 1, 2008, eligible lists were "in effect for a period of at least one year but not more than two years from the date of promulgation." (Def.'s Mot. for Summ. J., Ex. A-6, Doc. No. 35-9, at 18.)  The amended rule, in effect after February 1, 2008, states in pertinent part:

> The [Civil Service] Board shall set the duration
> of an eligible list at the time it is approved and the

Board may thereafter extend the duration of the list. The Board's actions shall be subject to the following:

(a) An eligible list shall initially be in effect for one year, or until 75 percent of the list has been exhausted, whichever comes first; provided, however, that the Board shall be notified in advance of a list expiring, so that the Board has the opportunity to extend its duration;

(b) Prior to its exhaustion, the Board may extend the duration of a previously approved eligible list provided that no eligible list shall be in effect for more than two years.

(Id., Ex. A-7 ("Amended Civil Service Rules"), Doc. No. 35-10, at 14.)

On July 14, 2009, the Civil Service Board (the "CSB") held a meeting to decide whether to certify the results of the April 2009 exam, i.e., Eligible List 09-06, and to set the list's initial certification period.  Attendees included three CSB commissioners: James Segaloff, Chair ("Segaloff"), Frank LaDore, and Anne Massaro ("Massaro").  During the meeting, Noelia Marcano ("Marcano"), Secretary of the CSB, informed the CSB that Resource Management Association ("RMA") was hired to administer the exam process.  Marcano summarized the exam results; the process that was used to develop, administer, and score the exam; and the validation report that analyzed the exam's process, job relatedness, and defensibility.

In discussing the validation report Marcano stated that "[f]rom an [Equal Employment Opportunity Commission ("EEOC")]

perspective the examination provided promotional opportunities for a diverse group of candidates.  The absolute numbers of black candidates who earned promotion eligibility exceeded those of other groups.  The only group whose promotion eligibility was consistently restricted by the examination was Hispanic candidates." (Def.'s Mot. for Summ. J., Ex. B ("July 14, 2009 Tr."), Doc. No. 35-11, at 4.)  Marcano explained that the EEOC applies the four-fifths rule ("4/5th Rule"), and that under that rule "there is adverse impact when a protected group selection ratio is less than 80% of the highest scoring group's selection ratio."  (Id. at 5.)  Applying the 4/5th Rule to the April 2009 exam, Marcano reported that "[t]he impact ratio showed that disparate impact did not occur in [the NHPD's exam process] for white males, white females, black males and black females." (Id.)  However, "there is evidence of disparate impact only for Hispanic men and women, none of whom had a passing score."  (Id.) Marcano explained that "[i]t was then important to have the data examined more closely."  (Id.)

Marcano stated that "[s]cientific and professional advances have provided statistical procedures that inform the use of the EEOC's 4/5th[] Rule."  (Id.)  She explained:

> Generally speaking these procedures involve using statistical theory to determine in specific situations whether a violation of the 4/5th[] Rule can be considered a substantive occurrence, or rather, it should be considered the result of random fluctuations

4

>     due to the error variability inherent in personal
>     testing. All measurements have error associated with
>     it. The error causes random and systematic
>     fluctuations in scores that are not attributable to
>     two candidate differences. In other words, these are
>     results that can occur by chance.

(Id.) Marcano also explained that "when there are no underlying

population or standardized group differences between subgroups"

"research literature points out that the 4/5th Rule can often

result in false positive readings" of adverse impact. (Id.)

However, false positive readings can be "mitigated and/or

eliminated" if tests of statistical significance are

incorporated with the 4/5th Rule. (Id.) This was relevant to

the April 2009 exam because "the number of Hispanic candidates

[was] small: 8 Hispanic males and 2 Hispanic females." (Id.)

Therefore, "[g]iven these small numbers of candidates the

determination of disparate impact must be done with broad

consideration of all available evidence." (Id.) Marcano stated

that "[a]ccording to the validation report for this exam,

statistical analyses conducted to examine the likelihood the

score differences are reliable versus attributable to natural

score fluctuations produced mixed results." (Id.)

    Marcano explained the results of the statistical analyses

as follows:

>     Specifically, the commonly used after the fact
>     statistical analyses indicated that the Hispanic mean
>     scores did not differ significantly from the others.
>     In other words, the analyses indicated that the

differences are not statistically reliable. Other
analyses did suggest that the differences were
sufficiently large to be considered statistically
reliable. Taken together, however, the results of
these analyses indicate that the differences in past
grades across the demographic roots are not large
enough to conclude with confidence that disparate
impact has occurred. This promotion exam is job
related in discernible ways, and it was designed and
administered consistent with current professional
standards. In addition, it is based on and consistent
with the validity evidence provided in the validation
report from the 2006 cycle of Police Sergeant
promotional testing. According to the validation
report for the current exam, it is reasonable to
conclude that scores on this examination reflect job-
related competencies and that without evidence to the
contrary decisions based on the observed differences
in candidates' performance can be considered
defensible by any number of professional and technical
guidelines. . . . Resource Management Associates has
certified in writing as to the accuracy of all test
results.

(July 14, 2009 Tr., Doc. No. 35-11, at 5-6.) In light of the

conclusion of the validation report, Marcano then presented

Eligible List 09-06 to the CSB for certification.

Following Marcano's presentation, Segaloff asked a few

questions to confirm the number of candidates who took the exam

and the number of candidates on Eligible List 09-06, and also to

confirm that none of candidates on the list was Hispanic.

Segaloff also asked a few questions about the exam process and

how the make-up of the April 2009 exam's oral evaluation panel

compared to the make-up of a past panel. In addition, Segaloff

asked some questions with respect to the validation report and

RMA, who administered the exam process. Massaro then asked,

"Can we go into Executive Session?  I have a question."  (Id. at
8.)  When asked whether she wanted to ask a legal question,
Massaro said, "Well, it's something that I can't (inaudible)[.]"
(Id.)  When asked what question she wanted to ask, Massaro said,
"Well, the question I have I don't think that the public should
hear what (inaudible) say. . . .  It'll just come out the way
it's gonna come out [] (inaudible).  I just feel uncomfortable
about it." (July 14, 2009 Tr., Doc. No. 35-11, at 9.)  When
asked whether her question concerned the test process, Massaro
said, "[R]egarding the Hispanics, like, I feel uncomfortable
that none of them passed this test.  I mean I didn't know -- I
mean, nothing against them --[.]"  (Id.)  When asked whether she
would like Marcano to address that point further, Massaro said,
"No, no. It's just that there were all the Hispanics that took
the test but did not pass it."  (Id.)

     Segaloff then expressed his concern as follows:

     Let me try to ask (inaudible) question that maybe --
     maybe phrase my concern in a different way.  I'm
     certainly concerned that being in this community,
     which is a very diverse community, that would give an
     exam and we have a situation -- we have a significant
     Latino population -- we have an exam and no Hispanics
     passed.  I think we -- well, I can't speak for
     everyone, but that's a concern.  But -- and we've been
     through a lot of issues on this -- the fact that a
     particular group did not pass, or a limited amount did
     not pass, I believe we've got to ask some other
     questions or satisfy other issues before -- we just
     can't leave it at "No one passed[.]"  And I think if
     we go back to the decision that has been out there
     that -- I don't mean to pontificate but this is just

my own personal view -- there's a couple of issues
that -- to look at. One is -- in my opinion -- is,
was it a disparate impact? And from what I heard
Noelia say -- if I understood what was in there --
that merely because there's a statistical imbalance,
right? And the statistics are sad. Look, look what
happened. But that doesn't in this case necessarily
say that what's in a legal context that was a
disparate impact. There's a variety of statements
that were made there that talk about potential --
the reason for the numbers the way they were. And then,
even if you conclude that there is a disparate impact
in these results, there's a number of other issues
you've got to deal with. Essentially and I -- what
can I say? It's been in my face for weeks now as the
report said that there's going to be a strong basis
essentially -- in my opinion there's going to be a
strong basis in evidence that the exam was flawed.
There was a problem with the exam. And we just heard
-- I'm not saying that's -- that's how I interpreted
part of that decision -- and we just heard a very --
as I heard it -- very specific remarks and statements
that at least led me to believe that this is -- that
this exam was not flawed. So at this point in these
discussions I don't see a basis to not certify these
results.

(July 14, 2009 Tr., Doc. No. 35-11, at 10.) Massaro then said,

"It's not that I thought the test was flawed -- . . . I said

that 10 Hispanics did not pass this test. . . . I'm just

uncomfortable with that, that's all." (Id.) In addition,

Massaro said, "It's just that what's going to happen down the

road now when these 10 Hispanics find out they all failed.

That's what my concern was and that's why I was

uncomfortable. . . . It's just that I was thinking down the

road -- you know -- that's what I was thinking. . . ." (Id. at

13.) Massaro also said, "Yeah, well, let me just say that it's

not fair to this group that's on this list if somewhere outside they want to stop this list from going through. That's what I was worried about. . . .  That's the only thing I was worried about because it's a good list.  The people on this list deserve to be on this list but someone out there might turn around and say 'Well, I don't think it's right.'"  (Id. at 14.)

Additional discussion was held, including discussing the effect of Ricci v. DeStefano, 557 U.S. 557 (2009), on administering promotional exams.  Ultimately, the CSB voted unanimously to certify Eligible List 09-06.

After certifying the list, Segaloff raised the question of when the list was going to expire.  It was explained during the meeting that "the Civil Service Board is going to try to adopt a practice where you . . . make a separate motion and take a vote on when you think the list should expire. And . . . there's been a recommendation from the department for one year[.]"  (Id. at 18.)  The CSB then discussed whether the list would be certified for one year.

> J. Segaloff: I just want to be clear, do our rules provide that it is for one year unless we vote otherwise?
>
> K. Foster: Our rule is not particularly -- our rule says one year or until 75% (inaudible).
>
> J. Segaloff: All right.  So why don't we do a sort of belt suspender –
>
> K. Foster: Yeah, we like that.

J. Segaloff: So the question is do we do this for a
year?  Emmett, you have a recommendation?

E. Hibson: I have a recommendation that this be done
for one year.  We have [the] ability to come back to
Commission and ask for a second year prior to the
expiration of the list.

(Id.)  The CSB then unanimously voted to certify the eligible

list for one year.  Subsequently, nine candidates were promoted

based on Eligible List 09-06.

On July 13, 2010, the CSB held another meeting.  Marcano

and Massaro were in attendance, but Segaloff was not.  During

the meeting, the CSB discussed two items: certification of an

eligible list for lead 911 operator dispatcher and a request for

appointment of a temporary employee who had not yet taken the

necessary exam to fulfill a critical administrative support

position in the City's health department.  No discussion was

held regarding Eligible List 09-06, including whether to extend

the list for a second year.

On July 14, 2010, the New Haven Board of Police

Commissioners (the "Board of Police Commissioners") held a

public meeting.  During the meeting, NHPD Officer Bruce Bonner,

who was ranked 13th on Eligible List 09-06, asked Commissioner

Richard Epstein ("Epstein") why Eligible List 09-06 was expiring

after only one year.  A representative of the Board of Police

Commissioners immediately contacted Massaro to inquire whether

Eligible List 09-06 would be extended.  Massaro informed the representative that the list expired that very day.

Prior to the amended rules, at least one list, Eligible List 06-20, was initially certified for one year.  Since the amended rules went into effect on February 1, 2008, fifteen public safety eligible lists have been certified by the CSB. Two of the fifteen lists were initially certified for two years,[2] notwithstanding the language of the rule that "[a]n eligible list shall initially be in effect for one year or until 75 percent of the list has been exhausted, whichever comes first . . . ."  (Amended Civil Service Rules, Doc. No. 35-10, at 14.)  The other thirteen lists were initially certified for one year; two of the thirteen were exhausted and one remained active. Of the other ten lists, five were extended at least once and five were not extended.

| List | Initial Certification | Extension/Exhaustion |
|------|----------------------|---------------------|
| Eligible List 08-23 | One year | One extension |
| Eligible List 09-02 | One year | Two extensions |
| Eligible List 09-06 | One year | No extension |
| Eligible List 09-20 | One year | No extension |
| Eligible List 10-12 | One year | No extension |
| Eligible List 10-17 | One year | No extension |
| Eligible List 10-18 | One year | No extension |
| Eligible List 11-01 | One year | Two extensions |
| Eligible List 11-02 | One year | Two extensions |
| Eligible List 11-03 | One year | Two extensions |
| Eligible List 12-02 | One year | List exhausted |
| Eligible List 12-23 | One year | Still active |
| Eligible List 13-09 | One year | List exhausted |

---

[2] The City represents that these two lists are for entry-level firefighter and entry-level firefighter/paramedic.

| Eligible List 13-14 | Two years | Still active |
|---------------------|-----------|--------------|
| Eligible List 13-15 | Two years | Still active |

## II.  **Legal Standard**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is

"genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248.  Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  Immaterial or minor facts will not prevent summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(quoting Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). However, the inferences drawn in favor of the nonmovant must be supported by evidence.  "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. Stern v. Trustees of Columbia University, 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury

could "reasonably find" for the nonmovant.  Anderson, 477 U.S.
at 252.

### III. Discussion

Section 1983 provides for an action at law against "[e]very
person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State . . . subjects, or causes to be
subjected, any citizen of the United States . . . to the
deprivation of any rights, privileges, or immunities secured by
the Constitution and laws . . . ."  42 U.S.C. § 1983.  The
Second Circuit has stated that "[i]n analyzing whether conduct
was unlawfully discriminatory for purposes of § 1983, we borrow
the burden-shifting framework of Title VII claims." Annis v.
Cnty. Of Westchester, 136 F.3d 239, 245 (2d Cir. 1998).  "Most
of the core substantive standards that apply to claims of
discriminatory conduct in violation of Title VII are also
applicable to claims of discrimination in employment in
violation of . . . the Equal Protection Clause . . . ."
Patterson v. Cnty. of Odeida, 375 F.3d 206, 225 (2d Cir. 2004).
In addition, where the defendant sued for discrimination under
§ 1983 is a municipality, "the plaintiff is required to show
that the challenged acts were performed pursuant to a municipal
policy or custom[.]" Patterson, 375 F.3d at 226 (citing, inter
alia, Monell v. Dep't of Social Services, 436 U.S. 658, 692-94
(1978)).  Furthermore, "a plaintiff pursuing a claimed . . .

denial of equal protection under § 1983 must show that the discrimination was intentional[.]"  Id. (internal citations omitted).

Under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff asserting racial discrimination bears the initial burden of establishing a prima facie case of discrimination.  If a plaintiff successfully establishes a prima facie case of discrimination, "the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action."  Weinstock, 224 F.3d at 42.  "Upon the defendant's articulation of such a non-discriminatory reason, the presumption of discrimination arising with the establishment of the prima facie case drops from the picture."  Id.  The burden shifts back to the plaintiff to "come forward with evidence that the defendant's proffered, non-discriminatory reason is mere pretext for actual discrimination."  Id.

The City does not argue that the plaintiffs failed to establish a prima facie case.  In addition, the City, as discussed below, has articulated legitimate, non-discriminatory reasons.  However, the City asserts that it is entitled to summary judgment because there is no evidence that the City maintained a policy that violated the plaintiffs' equal

protection rights, or that the City intentionally discriminated against the plaintiffs.

A.   Municipal Policy

The City asserts that summary judgment should enter against the plaintiffs because there is no evidence that the City maintained a policy that violated their rights.  In Monell, the Supreme Court stated that "[l]ocal governing bodies . . . can be sued directly under § 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  436 U.S. at 690. Here, the act in question, certifying the 09-06 Eligible List for an initial period of one year, was taken by a unanimous vote of the CSB, and the CSB has the exclusive power under the City's Civil Service Rules to certify eligible lists and to determine their initial certification period.  See Goldberg v. Town of Rocky Hill, 973 F.2d 70, 72 (2d Cir. 1992) (noting that all parties agreed that resolution passed by town council eliminating all supernumerary police officer positions qualifies under Monell as municipal policy made by its lawmakers for which the town could be held liable absent immunity).  Therefore, the plaintiffs have identified a municipal policy.

B.   *Intentional Discrimination*

1.   *Initial Certification*

The City asserts that there is an absence of evidence that the CSB initially certified Eligible List 09-06 for one year because of the race of the candidates.  The court finds that genuine issues of material fact exist as to whether the CSB's decision was motivated by the fact that the list included no Hispanic candidate.

The City contends that after the amended rules became effective, eligible lists routinely were certified for an initial one-year period and Eligible List 09-06 was certified for one year just like the prior two eligible lists.[3]  Segaloff states in his affidavit that it was his understanding that "since the Civil Service Rules were amended in 2008, Public Safety Exam Lists were now <u>routinely</u> being certified for one year . . . ."  (Segaloff Aff., Doc. No. 35-12, ¶ 12) (emphasis added).  However, the July 2009 meeting transcript reflects that the CSB did not discuss whether prior eligible lists were certified for one year, and Segaloff's sworn statement is not entirely consistent with his question at the meeting as to

---

[3] The plaintiffs assert that previous sergeant promotional exams had been certified for two years.  However, Police Commissioner Richard Epstein's testimony appears to be that past eligible lists remained in effect for two years as opposed to initially certified for two years. (<u>See</u> Dep. of Richard Epstein, Doc. No. 36-3, at 9:6-19.)

whether the list would be certified for one year unless the CSB voted otherwise nor with Segaloff's suggestion of a "belt suspender" approach.

The City also appears to contend that the amended rule concerning certification sets an initial certification period of one year as a ceiling.  However, the amended rule states that the CSB "shall set the duration of an eligible list at the time it is approved" subject to the condition that "[a]n eligible list shall initially be in effect for one year[.]"  (Amended Civil Service Rules, Doc. No. 35-10, at 14.)  If the amended rule is interpreted to set a one-year ceiling, this interpretation would read out of the rule the language providing that the CSB "shall set the duration of an eligible list at the time it is approved" because all eligible lists would initially be certified for one year.  A more reasonable interpretation is that the initial certification period must be at least one year. Moreover, the transcript of the July 2009 meeting does not reflect any recognition by the CSB that the amended rule imposed a one-year ceiling for Eligible List 09-06.  Rather, the transcript reflects that the CSB discussed what the initial certification period should be and affirmatively voted to certify the list for one year.

In addition, the transcript reflects a number of inconsistencies and ambiguities.  First, Massaro asked to go

into Executive Session to ask a question that she did not
believe the public should hear.  Massaro then said she felt
uncomfortable that no Hispanic passed the April 2009 exam, but
later she said she believed Eligible List 09-06 was a good list
and stated that the people on the list deserved to be there and
that her concern was with respect to what others might say about
the list.  Second, Segaloff expressed his concern that the
community has a significant Latino population yet the CSB had an
exam that no Hispanic passed.  And while he voted to certify
Eligible List 09-06, he also suggested that the CSB take a "belt
suspender" approach and initially certify the list for one year.
The transcript reflects that others liked that approach, but
neither the transcript nor the record provides an explanation as
to what Segaloff meant by "belt suspender."  Third, the
transcript reflects that Emmett Hibson ("Hibson"), then-Director
of Organizational Development, made the recommendation that the
list be initially certified for one year and reasoned that the
CSB had the "ability to come back to Commission and ask for a
second year prior to the expiration of the list." (July 14, 2009
Tr., Doc. No. 35-11, at 18.)  Hibson's comment could be taken as
suggesting that the CSB believed that it had the ability to
request an extension.  However, this would be inconsistent with
the City's assertion that "[i]t was the understanding of the
members of the CSB, that they were not required to consider

19

whether to extend the life of an eligible list unless someone
brought the impending expiration to their attention."  (Def.'s
Local Rule 56(a)(1) Statement, Doc. No. 35-2, ¶ 34.)

Therefore, assessing the record in a light most favorable
to the plaintiffs, genuine issues of material fact exist as to
whether the CSB certified Eligible List 09-06 for one year in
2009 because it was its routine practice to do so or because of
the race of the candidates on the list.  See Ramseur v. Chase
Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989) ("We have
repeatedly noted that summary judgment is ordinarily
inappropriate where an individual's intent and state of mind are
implicated.") (internal quotation marks omitted).

2.  *Extension*

The City asserts that there is no evidence that Eligible
List 09-06 was allowed to expire after one year because of the
race of the candidates, but rather that the list expired because
no extension was requested during the CSB's July 13, 2010
meeting.  The plaintiffs contend that a request for an extension
was made by the Board of Police Commissioners on July 14, 2010.
However, it is undisputed that the request was made to Massaro
on the day the list was set to expire and after the CSB's July
13, 2010 meeting, and nothing in the record suggests that the
CSB could have reconvened on July 14 to discuss extending

Eligible List 09-06 or that the CSB has the ability to extend an eligible list after it has expired.

The City has proffered legitimate, non-discriminatory reasons why the NHPD did not ask the CSB to extend Eligible List 09-06.  The City asserts that the NHPD was undergoing a transition in 2010.  Specifically, in July 2008, James Lewis was brought in from out-of-state to serve as the Chief of Police, and he brought two officers from out-of-state to serve as two of his four Assistant Chiefs.  Peter Reichard and Stephanie Redding also served as Assistant Chiefs.  As of January 31, 2010, Lewis and his two Assistant Chiefs from out-of-state left the NHPD.  Peter Reichard retired in February 2010.  In April 2010 and three months before Eligible List 09-06 was set to expire, Frank Limon was brought in from out-of-state to serve as Chief of Police, and he brought two officers from out-of-state with him to serve as two of his four Assistant Chiefs.  Stephanie Redding then retired as of June 28, 2010, about two weeks before the list expired.  "Chief Limon's acclimation to the structure of the police department and City government happened slowly over the course of several months."  (Def.'s Mot. for Summ. J., Ex. H ("Stephanie Redding Aff."), Doc. No. 35-17, ¶ 11.)  Therefore, given the "great transition in the department with the new Chief and Assistant Chiefs being placed . . . [the NHPD] [was] not in a position to promote sergeants at that time."  (Id., ¶ 18.)

Moreover, Redding avers that the NHPD did not request the list to be extended, in part, because "there were serious concerns about promoting the next few candidates on the list[]"; namely, Matthew Deleo ("Deleo"), Eric Scott ("Scott"), and Shafiq Abdussbaur ("Abdussbaur").  (Id., Doc. No. 35-17, ¶¶ 19, 22-25.)

The plaintiffs argue, without proffering evidence, that the new chief would have had plenty of time to familiarize himself with the officers on Eligible List 09-06 prior to making promotions.  In addition, with respect to Deleo and Scott, the plaintiffs admit that they had performance issues.  With respect to Abdussbaur, the plaintiffs do not deny that his employment was terminated and the termination was later converted into an indefinite suspension, nor that Abdussbaur was given a three-day suspension related to a firearm that was used in a homicide. The plaintiffs assert that other officers have been promoted despite blemishes in their personnel files, but that assertion does not rebut the City's explanation that the NHPD was undergoing a transition.  The plaintiffs also argue that the list would have been extended under past practice, but they proffer no evidence that the NHPD or Chief Limon decided to follow past practice, or that the CSB made a decision that it would not follow past practice.  Consequently, the plaintiffs have not proffered evidence sufficient for a reasonable jury to

conclude that the City's proffered legitimate, non-discriminatory reasons are a pretext for race discrimination.

Finally, in disputing the City's assertion that no vote was taken by the CSB regarding Eligible List 09-06 during the 2010 meeting the plaintiffs rely on Massaro's deposition testimony. The plaintiffs contend that Massaro, who made several comments about the absence of Hispanic officers on the list during the July 2009 meeting, testified during her deposition that the CSB affirmatively voted in the 2010 meeting to allow the list to expire and not extend it.  Massaro testified as follows:

> Q: Now, tell me about the process of expiring the list. Did you take a vote?
>
> A: Yes.
>
> Q: And what was the vote specifically? That we will expire the list or that we will not extend the list? Or what was the vote?
>
> A: We didn't extend the list.
>
> Q: Okay. So somebody moved that filed a motion to -- that the list not -- I shouldn't say file.  Somebody moved -- you do it orally at the board, right?
>
> A: Yes.
>
> Q: Somebody moved that the list not be extended, "all in favor say aye"?
>
> A: Yes.
>
> Q: Okay. And I take it it was a unanimous vote?  Or not?
>
> A: Yes.

Q: Do you remember who made the motion?

A: No.

Q: Was there -- were all the members of the board present when the vote was taken?

A: I am not sure because now there were new [members] there and then they're gone now, so --

Q: Okay. But anyway, you were there?

A: Yes, I was.

Q: And I take it that you voted in favor of --

A: Yes.

Q: -- letting it expire?  Okay.  Now, how did you as a board member know what the chief of police's position was on that issue?

A: I don't understand.

Q: In other words, maybe I am leaping to conclusions. I assumed from your answer that you voted the way you did at the recommendation of the police chief.  Am I wrong?  Or am I right about that?

A: No, you're right about that.

Q: How did you know what the police chief's recommendation was?

A: That he was not extending the list for another year.

Q: How did you find that out?

A: We were told that at our meeting.

(Ann Massaro Deposition ("Massaro Dep."), Doc. No. 36-4, at

15:19-17:16.)  When Massaro was cross-examined by her attorney,

she confirmed voting to expire Eligible List 09-06 during the

2010 meeting.

Q: Somebody -- did somebody present to the Civil
Service Board in July, 2010 the statement that the
chief does not want to extend the list?

A: No.  I don't remember that.  All[] I know is that
the list came before us and it wasn't being extended.

Q: Okay.  Do you remember taking a vote "yes" or "no"
that the list is not being extended?

A: Yes.

. . . .

Q: But as you sit here today, you do recall voting yes,
I want this list to expire?

A: Yes.

Q: And it was a 2009 sergeants exam list?

A: Yes.

(Id., 30:12-22; 31:6-11.)  Subsequently, Massaro executed an

errata sheet to her deposition.  The errata sheet contains more

than fifty amended responses, amending Massaro's testimony,

inter alia, to state that she was mistaken with respect to

voting affirmatively to expire Eligible List 09-06 and that no

such vote was taken during the 2010 meeting.

"[W]hen a party amends his testimony under Rule 30(e), the

original answer to the deposition questions will remain part of

the record and can be read at the trial." Podell v. Citicorp

Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997).  However,

"[i]ncontrovertible evidence relied on by the moving party, such

as a relevant videotape whose accuracy is unchallenged, should

be credited by the court on such a motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007). Massaro's deposition testimony remains a part of the record, but the fact that the 2010 meeting minutes and the audio recording of the meeting show that the CSB discussed and took action on two items only and neither item was Eligible List 09-06 is dispositive.  The plaintiffs do not challenge the accuracy of the minutes and the audio recording.  Therefore, the court credits the 2010 meeting minutes and the audio recording, and they establish that the CSB did not discuss Eligible List 09-06, much less vote to allow the list to expire.

Therefore, the court concludes that there is no genuine issue with respect to the fact that the list expired because no extension was requested prior to or during the CSB's July 13, 2010 meeting, as opposed to because of the race of the candidates.

## IV.  Conclusion

Accordingly, the City's Motion for Summary Judgment (Doc. No. 35) is hereby GRANTED in part and DENIED in part.  The motion is granted with respect to the plaintiffs' claim that the City intentionally discriminated against the plaintiffs based on race by not extending Eligible List 09-06 for a second year.

The motion is denied with respect to the plaintiffs' claim that the City intentionally discriminated against them based on race by certifying Eligible List 09-06 for an initial period of one year.

It is so ordered.

Signed this 29th day of September 2014, at Hartford, Connecticut.

/s/
_____
Alvin W. Thompson
United States District Judge
